UNITED STATES DISTRICT COURT<br>
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

---

LAWRENCE SCOTT,

               Petitioner,

      - versus -

MICHAEL SHEAHAN,<br>
Supt., Five Points Correctional Facility,

               Respondent.

MEMORANDUM AND ORDER

12-CV-6235 (JG)

APPEARANCES:

        LAWRENCE SCOTT<br>
            #08-A-5408<br>
            Five Points Correctional Facility<br>
            State Route 96<br>
            P.O. Box 119<br>
            Romulus, New York 14541<br>
            *Petitioner, Pro Se*

        ERIC T. SCHNEIDERMAN<br>
            Assistant Attorney General<br>
            State of New York<br>
            120 Broadway<br>
            New York, New York 10271<br>
        By:   Joanna Hershey<br>
            *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

      Lawrence Scott, who is currently incarcerated at Five Points Correctional Facility,

petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After a jury trial in the

Supreme Court of New York, Queens County, Scott was convicted of two counts of robbery in

the first degree, two counts of robbery in the second degree and one count of criminal possession

of stolen property in the third degree.

Scott was sentenced as a persistent offender to concurrent terms of imprisonment of twenty-five years to life on each of the four robbery counts and a three and one-half to seven year term, also concurrent, on the stolen property count. Scott now seeks habeas relief from his conviction and sentence on the following grounds: (1) the state court improperly denied his application for a *Wade* hearing; (2) the prosecutor improperly cross-examined him regarding his post-arrest silence, and the error was not harmless; and (3) his sentence as a persistent offender violated the Sixth Amendment. Oral argument was held on June 28, 2013. Scott appeared at the argument by videoconference from Five Point Correctional Facility, the institution in which he is currently serving his sentence. For the reasons stated below, Scott's petition is denied.

## BACKGROUND

### A.  *Overview of Offense*

At approximately 5:00 p.m. on July 6, 2006, two robbers, armed with handguns, forced their way into the Moonlight Jewelry Store in the Jackson Heights neighborhood in Queens. Tr. at 248-249.[1] A third, unidentified suspect was waiting for them in a getaway car. Tr. at 258. The men pointed their weapons at the store's employees and customers and forced them to lie on the floor while the robbers stole 15 to 20 watches and ten rings. Tr. at 254-257. The robbers then fled in a car driven by the unidentified man. Tr. at 258.

Shehrazad Saeed ("Shehrazad")[2], one of the employees, followed the robbers as they left the store. Shehrazad saw them enter a blue Honda Civic, and he pursued them in a taxi. He saw the men get out of the Honda and enter the Woodside Houses, a housing project in the Woodside section of Queens. Tr. at 258-261. Shehrazad eventually met up with a police officer

---

[1]     Citations to the trial transcript are preceded by "Tr." Citations to the pre-trial hearing are preceded by "Pt.," and citations to the sentencing minutes are preceded by "S."

[2]     The spelling of "Shehrazad" is taken from the trial transcript. It is spelled different in the parties' briefing.

and joined the officer in the officer's car to canvass the area.  When he saw Scott emerge from the housing projects, Shehrazad identified Scott as one of the men who had robbed the store. Scott was arrested and was found to be in possession of two watches and four rings stolen from the store.  Tr. at 434.  A subsequent search of the getaway car led to the seizure of additional property stolen from the store.  Tr. at 439.

B.          *The Procedural History*

1.  *The Request for a* Wade *Hearing*

Prior to trial, Scott filed an omnibus motion requesting, *inter alia*, a *Wade*[3] hearing.  He contended that Shehrazad's identification of him was the product of an unnecessarily suggestive identification procedure.  The prosecution opposed the request for a *Wade* hearing on the ground that there was no *police-arranged* identification procedure. Specifically, the prosecutor asserted on information and belief that Shehrazad had simply pointed out Scott as Shehrazad was walking with the police around the Woodside Houses.  *See* Ex. A of Def.-App.'s Br. at 5 (ECF No. 8-1).   The hearing court denied Scott's motion on the basis that no police-arranged identification procedure had occurred.  Pt. at 3.   At a subsequent *Mapp*[4] hearing, however, Officer Douglas George, the officer who was present when Shehrazad made the identification, testified that Shehrazad was actually seated in the back of Officer George's police vehicle at the time the identification occurred.  Pt. at 11-12, 16-17.

2.  *The Evidence at Trial*

---

[3]        A *Wade* hearing is a pre-trial hearing held to determine whether identification procedures were unduly suggestive.  *See United States v. Wade,* 388 U.S. 218, 232 (1967) (holding that a post-indictment lineup is a critical stage requiring counsel's presence).

[4]        A *Mapp* hearing is a pre-trial hearing conducted to determine whether certain evidence should be suppressed on the ground that it was obtained as a result of unlawful search and seizure.  *See Mapp v. Ohio*, 367 U.S. 643 (1961).

At trial, both Shehrazad and his brother, Shiraz Saeed ("Shiraz") testified about the events surrounding the robbery. Shehrazad testified that on or about 5:00 p.m. on July 6, 2006, two black gunmen forced their way into the jewelry store. Tr. at 242-243. When the heavier of the two men, later identified as Scott, first came into the store, he was holding a metallic-colored gun. He was also facing Shehrazad, who had a clear view him. Tr. at 274-275. Shehrazad described him as a black male in his thirties, with a medium to dark complexion, scruffy facial hair, brown eyes and short black hair. Scott was wearing blue jeans, a long-sleeved black shirt of lightweight cotton, an orange construction vest, a yellow hard hat, white sneakers with holes on top for ventilation, and a see through "do rag," which he wore over his face in an attempt to conceal his identity. During the course of the robbery, Scott also wore white gloves with red tacky material on the fingertips. Tr. at 251-253.

Shehrazad attempted to reach the phone to dial 911, but Scott grabbed him by the collar and pulled him close, saying, "Don't move, get down." Shehrazad looked directly at Scott's face, and could see the shape of his nose and mouth through the 'do rag. Tr. at 255, 276. Also during the robbery, Scott dropped some items on the floor, and when he bent over to pick them up, he moved his 'do rag away from his face. By doing so, he gave both Shehrazad and Shiraz a good look at his face. Tr. at 256-257.

Prior to leaving the store, both robbers removed their 'do rags and casually walked out the side door. Both Shehrazad and Shiraz had the opportunity to observe Scott's face at that time. Tr at. 258, 277, 341, 527-28.

Shiraz dialed 911 and provided a description of the robbers while Shehrazad watched them get into the Honda Civic and followed. While following the Honda, Shehrazad was on the phone with a 911 operator.

The Honda eventually stopped at the corner of 51st Street and 31st Avenue, and the three men exited the vehicle carrying a black messenger bag, a plastic box, and a black plastic garbage bag. Shehrazad testified that Scott wore the same clothing he had on during the robbery (blue jeans, a black t-shirt and white sneakers), but had removed the construction vest, hard hat, gloves and 'do rag. Shehrazad got out of the taxi and followed the men on foot, observing Scott walking toward a building. Tr. at 265, 357-385.

After receiving several radio runs about the robbery, Officer George arrived at 50th Street and 31st Avenue. He saw the Honda Civic and found Shehrazad, who rode in the officer's vehicle with him. Tr. at 424-29, 451-53. Shortly after they entered the Woodside Houses, Shehrazad saw Scott walking out of one of the buildings and identified him as one of the robbers. Scott was placed under arrest and searched. Officer George recovered two Breitling watches and four rings from the Scott's person. The rings were stored in the fingers of a white and red glove, which Scott had in his front pocket. Shehrazad identified the items as stolen store property. Tr. at 432-433. Officer George also recovered a black 'do rag from a backpack Scott was carrying at the time of his arrest. Tr. at 433-435. Officer George then peered into the Honda Civic and saw yellow construction helmets and orange vests, dark gloves, hats and a display box containing more rings and a black 'do rag. Tr. at 437-38. The following day, Officer George obtained a search warrant for the Honda Civic and executed it. He later showed Shehrazad photos of other property discovered in the car, which Shehrazad identified as stolen store property. Tr. at 435-436.

Scott testified at trial that he did not commit the robbery. He said that as he was walking down 31st Avenue toward the Woodside Houses to see a basketball tournament, he ran into a man named Hector, who he knew form the neighborhood. Hector called out his street

name, ("Snook") and asked Scott to hold on to two watches for him.  Scott then proceeded to walk through the courtyard of the Woodside Houses, where he was arrested and searched.  Tr. at 599-600.

Scott acknowledged that the watches and a 'do rag were in his possession at the time of his arrest but denied that the police recovered a glove and any rings from his person.  Tr. at 631-634.

After his arrest, Scott was taken to the precinct, where he was handcuffed for an hour in an interrogation room.  Officer George and other officers entered and asked Scott to talk to them.  Scott asked for an attorney.  Tr. at 600-601.

On cross-examination, the prosecutor asked Scott whether he told the police that Hector had given him the watches.  Scott replied that he had not because he was repeatedly told to shut up, and he complied with this request.  Tr. at 636.  The prosecutor further inquired whether Scott had told the police that Hector was present near the scene of the arrest, as Scott had testified.  Tr. at 638.  The prosecutor continued, stating, "You are telling me that you were arrested for a crime you didn't commit and yet wouldn't tell the police that Hector gave you stolen property, and you sit here and not talk to the police."  The defense objected and the court sustained the objection.

### 3.  *The Verdict, Sentence and Direct Appeal*

After a seven-day jury trial ending on February 7, 2008, the jury found Scott guilty of two counts of robbery in the first degree, two counts of robbery in the second degree, and one count of criminal possession of stolen property in the third degree.  Tr. at 729-31.  On October 2, 2008, the court sentenced Scott as described above.

Scott appealed from his judgment of conviction to the Appellate Division, Second Department. He claimed that the motion court wrongly denied his request for a *Wade* hearing, that the prosecutor improperly questioned him about his post-arrest silence, and that the court improperly sentenced him in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). On June 7, 2011, the Appellate Division unanimously affirmed Scott's judgment of conviction. The court found that the lower court had properly denied Scott's request for a *Wade* hearing. It also observed that to the extent Scott's claim relied on evidence adduced at the *Mapp* hearing and at trial, it was unpreserved for appellate review since he did not seek to re-open his request for a *Wade* hearing. *People v. Scott*, 85 A.D.3d 827 (2d Dep't 2011). With regard to Scott's claim that the prosecutor improperly cross-examined Scott on his post-arrest silence, the court agreed that the prosecutor committed error, but held that the error was harmless because the evidence of Scott's guilt was overwhelming and there was no reasonable possibility that the error contributed to the verdict. *Id.* Lastly, the court denied petitioner's *Apprendi* claim as meritless. *Id.*

Scott sought leave to appeal to the New York Court of Appeals, asking the court to review all of the claims he had raised in the Appellate Division. On September 14, 2011, leave to appeal was denied. *People v. Scott,* 17 N.Y.3d 861 (2011) (Read, J.).

4. *The Instant Petition*

Scott timely filed the instant petition on December 10, 2012. It asserts the three claims that Scott fully exhausted on his direct appeal, which are (1) he was improperly denied a *Wade* hearing; (2) the prosecutor improperly examined him based on his post-arrest silence; and (3) his sentence violated the rule of *Apprendi*.

**DISCUSSION**

A.      *Standard of Review*

1. *Exhaustion and Procedural Default*

28 U.S.C. § 2254(b) prevents a federal court from granting a petition for a writ of habeas corpus unless the petitioner first has exhausted all available state judicial remedies. In order to have exhausted those remedies, a petitioner must have "fairly presented" his federal constitutional claim to the state courts by apprising them of "both the factual and the legal premises of the claim he asserts in federal court." *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). An unexhausted claim that can no longer be exhausted is deemed procedurally defaulted. *See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2011). ("[W]hen 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted." (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991))). Furthermore, where there has been actual and explicit reliance upon procedural default to dispose of a claim in state court, there is an "adequate and independent state ground" for judgment, prohibiting federal habeas review. *Harris v. Reed*, 489 U.S. 255, 261 (1989); *Galarza v. Keane*, 252 F.3d 630, 637 (2d Cir. 2001) (state court's reliance must be "unambiguous and clear from the face of the opinion"); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995); *see also Coleman v. Thompson*, 501 U.S. at 750 (noting the state's interests in "channeling the resolution of claims to the most appropriate forum, in finality, and in having the opportunity to correct its own errors"). *But see Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002) (noting the existence of a "small category" of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question").

A claim that has been procedurally defaulted in state court generally cannot be reviewed on the merits of a federal habeas court. *See Harris*, 489 U.S. at 260-62 (explaining rationale for habeas corpus procedural default rule); *see also Coleman*, 501 U.S. at 750. Procedural default on state law grounds may, however, be overcome by a petitioner who either demonstrates "cause for the default and prejudice attributable thereto, or … that failure to consider the federal claim will result in a fundamental miscarriage of justice." *See Harris,* 489 U.S. at 262. "Cause" is defined as "some objective factor, external to the defense [that] impeded counsel's efforts to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (citation omitted). Objective impediments to procedural compliance may exist where a factual or legal basis for a claim was not reasonably available to counsel, or where official interference made compliance impracticable. *Id*. (citing *Murray v. Carrier*, 477 U.S. 478, 488, (1986)). To show prejudice, a petitioner must demonstrate that the alleged error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (quotation marks omitted).

Even if petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he can show that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). This ground for excusing procedural default should be applied only in "extraordinary" cases, as courts deem substantial claims of actual innocence "extremely rare." *Schlup*, 513 U.S. at 321-22. (quoting marks omitted).

2.     *Review of State Court Adjudications on the Merits Under AEDPA*

A federal habeas court may grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence in the State court proceeding." 28 U.S.C. §2254(d).[5]  In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence. *Id*. § 2254(e)(1).  AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *See Harrington v. Richter*, 131 S. Ct. 770, 785 (2011); *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

The United States Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001).  A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413.  A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*  Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only

_____
[5]        This limitation on relief is frequently referred to as "AEDPA deference." *E.g.*, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011); *Berghuis v. Thompkins*, 560 U.S. 370, 372 (2010); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

"issue the writ in cases where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Richter*, 131 S. Ct. at 786.

B.    *Scott's Claims*

    *1.  The Refusal to Hold a* Wade *Hearing*

Scott claims that the trial court's denial of a *Wade* hearing deprived him of due process of law.  Specifically, he argues that the trial court improperly denied his request for a *Wade* hearing based on the prosecution's erroneous assertion that Shehrazad had identified Scott during a "point-out" on July 6, 2006 in the vicinity of 31-23 49th Street, in Queens.[6]  Implicit in Scott's argument, is that if such a hearing were granted, due process would have required the exclusion of Shehrazad's identification testimony at trial.  The Appellate Division held that to the extent subsequent testimony (at the *Mapp* hearing and trial) corrected that information and indicated a *Wade* hearing was needed, Scott procedurally defaulted the claim by failing to reopen his request for a *Wade* hearing based upon that evidence.  *See People v. Scott*, 85 A.D.3d 827 (2d Dep't 2011).

When identification procedures appear to be unnecessarily suggestive, due process requires pretrial screening and the exclusion of the identification testimony unless its reliability is established through independent evidence.  *See Manson v. Brathwaite*, 342 U.S. 98 (1977).  If a witness has made a pretrial identification, a challenge to that identification and to an in-court identification of the defendant at trial triggers a two-step inquiry.  *See United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).

---

[6]    The prosecution's opposition to Scott's omnibus motion asserted that Shehrazad identified petitioner as Shehrazad was walking with the police in the Woodside Houses.  However, the Officer involved subsequently testified at a *Mapp* hearing that the identification was made from the back of a police car as he and Shehrazad canvassed the area in an effort to locate the robbers.  Pt. at 11-12, 16-17.

The first step is to determine whether the pretrial identification procedures were unnecessarily suggestive. *Id.* at 973. If they were not, the challenge is denied, and the reliability of the identification is a question only for the jury. *See Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir. 1986). If the procedures were unnecessarily suggestive, the second step is to determine whether the identification testimony is nevertheless admissible because it is "independently reliable rather than the product of the earlier suggestive procedures." *Maldonado-Rivera*, 922 F.2d at 973. This determination depends on the circumstances surrounding the specific case. Factors to be weighed against the corrupting effect of a suggestive identification procedure in assessing reliability include (1) the opportunity of the witness to observe the criminal at the time of the crime, (2) the witness' accuracy of the description of the criminal, and (3) the time between the crime and confrontation. *See Neil v. Biggers*, 409 U.S. 188 (1972).

When the identification results from circumstances that are not police-arranged however, the defendant is not entitled to the procedures described. Rather, the defendant is limited to the constitutional safeguards available during all trials – compulsory process and cross-examination – in challenging the reliability of the identification testimony. *Perry v. New Hampshire*, 132 S. Ct. 716, 730 (2012) (abrogating *Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998)).

The Appellate Division correctly concluded that on the facts presented to the court at the time the request for a *Wade* hearing, a hearing was not appropriate. The prosecution opposed Scott's motion for a *Wade* hearing based on the ground that Scott was spontaneously identified by Shehrazad as they walked in the area of the Woodside Houses. *See* Ex. A of Def.-App.'s Br. at 5 (ECF No. 8-1). Though the prosecutor's version of events was mistaken, the

hearing court properly denied a hearing because in the circumstances described, there was no police-initiated identification procedure.  *See Perry*, 132 S. Ct. 716 (2012).

It is true that subsequent testimony by Office George cast the identification in a different light, one more akin to a show-up.  Nevertheless, when the evidence during the *Mapp* hearing demonstrated that the information upon which the trial court based its decision had been inaccurate, it was incumbent on defense counsel to bring this to the trial court's attention as part of a renewed request for a *Wade* hearing.  Having failed to do so, the Appellate Division properly found that Scott's claim was procedurally barred.  *See People v. Clanton*, 69 A.D.3d 754 (2010).  That result is perfectly consistent with the federal approach to such issues.  *See United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998).

In any event, Scott's claim has no merit.  A show-up is certainly the most suggestive identification procedure, but the due process clause only protects against *unnecessarily* suggestive identification procedures.  *See Brathwaite*, 342 U.S. 98 (1977).  In the immediate aftermath of a crime, the sort of canvassing that occurred in this case is common, and a quick confirmation by the victim can help to prevent arrest or detention for a line-up of an innocent suspect.  *See Brisco v. Ercole*, 565 F.3d 80, 88-89 (2d Cir. 2009).  *See also United States v. Bautista*, 23 F.3d 726, 730 n.6 (2d Cir. 1994) ("rather than excoriate the law enforcement officials involved for conducting an unduly suggestive procedure, one might commend them for their immediate efforts to ascertain and release innocent people.").

Even if Scott's pre-trial identification was the result of an unnecessarily suggestive identification procedure, I would be required to assess the independent reliability of that identification.  Here, Shehrazad had ample opportunity to observe Scott at the time of the robbery.  While in pursuit of the robbers, he provided a detailed description of Scott.  He never

lost sight of the vehicle, observed the robbers get out of the car and waited for the police to arrive. A very short period of time passed between the robbery and the identification. Accordingly, I conclude that even if the identification procedure was unnecessarily suggestive, the identification would nevertheless have been admissible at trial.

*2. The Prosecutor's Use of Scott's Post-Arrest Silence*

Scott claims that the prosecutor's cross-examination of him concerning his post-arrest silence violated his constitutional rights to due process and a fair trial. Respondent concedes that the cross-examination was inappropriate, violating the well-settled prohibition against any reference by the government to a defendant's post-arrest, post *Miranda*-warning invocation of his right to remain silent. *See Doyle v. Ohio*, 462 U.S. 610, 618-19 (1976).

The rule in *Doyle* "rests on the fundamental unfairness of implicitly assuring a suspect that this silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993). A prosecutor engages in the unconstitutional use of defendant's post-arrest silence when he or she attempts to use the fact of the defendant's silence as evidence from which the jury may draw an "impermissible inference" of guilt. *Greer v. Miller*, 483 U.S. 756, 764-65 (1987). Similarly, it is inappropriate to use the fact of defendant's refusal to speak to the police as evidence of guilt. The principle in *Doyle* is violated if the prosecutor "suggest[s] to the jury that [the defendant] must have been guilty because an innocent person would not have remained silent." *United States v. Kallin*, 50 F.3d 689, 694 (9th Cir. 1995) (quoting *United States v. Newman*, 943 F.2d 1155, 1158 (9th Cir. 1991) (internal quotation marks omitted). Indeed, this type of argument is "precisely the inference that *Doyle* forbids." *Id.*

The prosecutor asked Scott a series of questions regarding his failure to speak to the police after he was arrested. Specifically, the prosecutor attempted to elicit from Scott an explanation as to why he failed to inform the police that he had unwittingly received stolen property from Hector. Tr. at 636. She proceeded to ask the following questions:

- "[A]t the point that the police came, correct, you were the victim and you had property that Hector gave you? You supposedly saw the police stop Hector, since you were the victim, did you tell the police, he gave me those rings?

- "[S]o when the police were supposedly by Hector Santana, and he told you to shut up, you didn't say a word?

- "[A]nd you didn't tell the police there goes the guy who gave me those two watches?

- [Y]ou are telling me you were arrested for a crime you didn't commit and yet you wouldn't tell the police that Hector gave you stolen property, and you sit there and not talk to the police."

Tr. at 636-38. Defense counsel objected to the last of these questions and the court sustained the objection; undaunted, the prosecutor snidely asked Scott "You don't want to answer that?" Tr. at 639. The prosecutorial misconduct did not end there; the prosecutor explicitly relied in summation on Scott's post-arrest silence.[7] There is no doubt that the prosecutor violated Scott's constitutional rights when she cross-examined him about his post-arrest silence. Respondent does not argue otherwise.

Not every constitutional violation requires habeas relief, however. Rather, a "harmless error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type." *Brecht*, 507 U.S. at 638. Reversal is appropriate only if the

---

[7] The following statements were made at People's summation: "[I]f that's not enough evidence look at the defendant's action. At the time that the police got out of the car he tried to go the other way. If he was really just holding onto Hector's watch and he saw Hector at the time that the police stopped him, you saw his demeanor on the stand. You think that the police would have been able to shut him up? Absolutely not. He was on the stand and he kept talking and talking. You think the police, if they told him to be quiet, he would have? And let Hector, the one who supposedly gave him the watch, go? His own actions are consistent with guilt." Tr. at 684-85.

error "had substantial and injurious effect or influence in determining the jury's verdict." Id. at 631 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In determining whether this standard has been satisfied, court may consider a variety of factors, including "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994).

The state court found the *Doyle* violation to be harmless in light of the strong evidence of Scott's guilt. There is substantial evidence in the trial record supporting that conclusion. The evidence of the crime provided by the jewelry store's security video depicts two robbers, one shorter and heavier than the other. It portrayed the crime exactly as Shehrazad and Shiraz described in their testimony. Further, Shehrazad followed Scott and his companions in their escape, never losing sight of their Honda Civic, taking note of its license-plate number.

The taxi driver, who witnessed the immediate aftermath of the crime, took notice of the men getting into the Honda Civic and attested to its license plate number. He fully corroborated Shehrazad's testimony about the escape route and the robbers' final destination, the Woodside Housing Projects.

Significantly, when Scott, a 5'8 black man wearing a black t-shirt, blue jeans and white sneakers (which fit the victims' description of the shorter robber) was seized by the police within minutes of his arrival at the Woodside Houses, he was carrying fruits of the crime: two watches bearing the price tags applied by the jewelry store, as well as rings stolen from the store. He was also in possession of a 'do rag like the one the robbers used during the robbery and was identified by Shehrazad on the scene. Additionally, police recovered orange construction vests and yellow hard-hats from the Honda Civic, which the victims testified were used in the robbery.

In light of all the evidence, I cannot conclude that the state court's determination that the *Doyle* violation was harmless was an unreasonable application of law.

### 3. *Scott's Sentence as a Persistent Felony Offender Violated the Constitution*

Scott's challenge to his sentencing as a persistent violent offender is without merit. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. No *Apprendi* violation occurs, where, as here, a defendant receives an enhanced sentence under § 70.08 based on the fact that he has two prior violent felony convictions.

## CONCLUSION

For the foregoing reasons, the petition is denied. As Scott has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

SO ORDERED.

John Gleeson, U.S.D.J.

Date: July _, 2013
Brooklyn, New York